## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| **E.P., by and through his mother and, next friend, THEA PORTENIER,**    ) ) ) | |
| **Plaintiff,**    ) ) | |
| **v.**    ) ) ) | **Case No. 09-cv-04163-JAR** |
| **UNITED STATES OF AMERICA,**    ) ) | |
| **Defendant.**    ) ) | |

## MEMORANDUM AND ORDER

This case involves a very tragic situation.  Plaintiff E.P. endured such severe child abuse at the hands of his potential adoptive mother, Holly Bellinger, that he sustained catastrophic and permanent brain damage.  Sadly, despite the concern, inquiry and examination by many individuals, including his biological mother, a doctor and nurse practitioner at Irwin Army Community Hospital ("IACH"), and a Riley County Health Department worker, Ms. Bellinger's abuse continued over the course of E.P.'s first month of life. As a result, the once healthy baby boy now has cerebral palsy that will limit him for his entire life.

Plaintiff seeks damages from the United States of America under the Federal Torts Claims Act ("FTCA") for injuries that Plaintiff sustained from Ms. Bellinger's abuse, alleging that the doctor and nurse practitioner who examined him at his two-week well-baby exam at IACH failed to diagnose and treat him for child abuse.  The case is now before the Court on Plaintiff's Motion to Exclude Defendant's Evidence of E.P.'s Life Expectancy (Doc. 110), Motion for Partial Summary Judgment (Doc. 122), and Motion to Amend Pretrial Order (Doc. 136) and Defendant's Motion to Dismiss or, in the Alternative, Motion for Summary Judgment

(Doc. 133).  As described more fully below, while the Court is sympathetic for the grievous

harm done to this innocent child, E.P., the Court nonetheless must grant Defendant's Motion to

Dismiss or, in the Alternative, Motion for Summary Judgment because the doctor and nurse

practitioner committed no medical negligence, for their legal duty to diagnose and treat E.P. did

not extend to reporting any suspected child abuse.  Because the Court grants Defendant summary

judgment, the Court denies Plaintiff's Motion to Exclude Defendant's Evidence of E.P.'s Life

Expectancy, Motion for Partial Summary Judgment, and Motion to Amend Pretrial Order as

moot.

## I.       Defining Plaintiff's Claims

Before discussing the merit of the motions, the Court must determine the extent of

Plaintiff's claims.  The parties have been in dispute about the scope of Plaintiff's allegations.

Within Plaintiff's response to Defendant's motion for summary judgment and Plaintiff's motion

for leave to amend, Plaintiff has withdrawn or narrowed the scope of his allegations.  Plaintiff,

for example, withdrew his claim alleging Defendant negligently discharged Plaintiff from the

hospital to the custody of Holly Bellinger and also withdrew allegations of negligence on the

part of Kim Kluesner.  The Plaintiff has further narrowed his claim from that outlined in the

Pretrial Order by stating that he only claims medical negligence by Dr. Thomas Talbot and nurse

practitioner Captain Wayne Darsow for failure to diagnose and treat child abuse:

> The only allegation plaintiff makes is that a health care provider be required to meet
> the accepted standard of care in his diagnosis of a patient and in his treatment of the
> patient.  Plaintiff's evidence will be that, if Captain Darsow and Dr. Talbot had
> followed the accepted standard of medical care, they would have made the proper
> diagnosis that E.P.'s bruises were caused by child abuse.  They then would have
> followed the accepted standard of medical care in reporting their diagnosis of child

abuse and the mandated investigation would then have ensued.[1]

Plaintiff makes clear that he withdraws every other theory of recovery besides the medical negligence claim described above. And so, the Court dismisses all other claims. Thus, the only claim before the Court is Captain Darsow's and Dr. Talbot's medical negligence in failing to diagnosis and treat Plaintiff's child abuse.

## II.     Motion to Dismiss

Defendant moves to dismiss all claims other than those against Dr. Talbot and Captain Darsow because Plaintiff did not properly exhaust the other claims as required under the FTCA. Because the claims were not exhausted, Defendant argues, the Court has no subject matter jurisdiction over those claims. As described above, however, Plaintiff has withdrawn all claims other than those for medical negligence against Dr. Talbot and Captain Darsow, and the Court has dismissed those claims. As a result, Defendant's argument that the Court must dismiss those claims for lack of subject matter jurisdiction is moot.

## III.    Defendant's Motion for Summary Judgment

The Court next examines Defendant's motion for summary judgment. Defendant argues that it is entitled to judgment as a matter of law because Dr. Talbot and Captain Darsow did not owe Plaintiff a legal duty to protect him from harm by a third party. Plaintiff, on the other hand, claims that Dr. Talbot and Captain Darsow had a duty to protect him from harm within their duty to diagnose and treat him.

### A.      Summary Judgment Standard of Review

Summary judgment is appropriate if the moving party demonstrates that there is "no

---

[1]Doc. 140 at 23.

genuine dispute as to any material fact" and that it is "entitled to a judgment as a matter of law."[2] In applying this standard, the Court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party.[3]  A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim."[4]  An issue of fact is "genuine" if "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way."[5]

The moving party initially must show the absence of a genuine issue of material fact and entitlement to judgment as a matter of law.[6]  In attempting to meet this standard, a movant that does not bear the ultimate burden of persuasion at trial need not negate the other party's claim; rather, the movant need simply point out to the court a lack of evidence for the other party on an essential element of that party's claim.[7]

Once the movant has met this initial burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial."[8]  The nonmoving party may not simply rest upon its pleadings to satisfy its burden.[9]  Rather, the nonmoving party must

---

[2]Fed. R. Civ. P. 56(a).

[3]*Spaulding v. United Transp. Union*, 279 F.3d 901, 904 (10th Cir. 2002).

[4]*Wright ex rel. Trust Co. of Kan. v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001) (citing *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998)).

[5]*Adler*, 144 F.3d at 670 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

[6]*Spaulding*, 279 F.3d at 904 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)).

[7]*Adams v. Am. Guar. & Liab. Ins. Co.*, 233 F.3d 1242, 1246 (10th Cir. 2000) (citing *Adler*, 144 F.3d at 671).

[8]*Anderson*, 477 U.S. at 256; *Celotex,* 477 U.S. at 324; *Spaulding*, 279 F.3d at 904 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

[9]*Anderson*, 477 U.S. at 256; *accord Eck v. Parke, Davis & Co.*, 256 F.3d 1013, 1017 (10th Cir. 2001).

"set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant."[10]  To accomplish this, the facts "must be identified by reference to an affidavit, a deposition transcript, or a specific exhibit incorporated therein."[11]  Rule 56(c)(4) provides that opposing affidavits must be made on personal knowledge and shall set forth such facts as would be admissible in evidence.[12]  The non-moving party cannot avoid summary judgment by repeating conclusory opinions, allegations unsupported by specific facts, or speculation.[13]

Finally, summary judgment is not a "disfavored procedural shortcut"; on the contrary, it is an important procedure "designed to secure the just, speedy and inexpensive determination of every action."[14]  In responding to a motion for summary judgment, "a party cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial."[15]

## B.    Uncontroverted Facts

Defendant objected to some of Plaintiff's factual statements because they were not supported by citation to evidence in accordance with the Federal Rules of Civil Procedure.  The Court need not resolve these objections, however, because the facts supported by the challenged

---

[10]*Mitchell v. City of Moore, Okla.*, 218 F.3d 1190, 1197–98 (10th Cir. 2000) (quoting *Adler*, 144 F.3d at 671).

[11]*Adams*, 233 F.3d at 1246.

[12]Fed. R. Civ. P. 56(c)(4).

[13]*Id.*; *Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1199 (10th Cir. 2006) (citation omitted).

[14]*Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).

[15]*Conaway v. Smith*, 853 F.2d 789, 794 (10th Cir. 1988).

evidence are not material to the issue in the motion for summary judgment.  With the above rules of law and principles of application in mind, the following material facts are uncontroverted, stipulated to, or viewed in the light most favorable to plaintiffs.

Plaintiff was born at IACH, in Fort Riley, Kansas, on December 29, 2003.  Plaintiff was a generally healthy infant, noted to have facial bruising around the mouth.  Plaintiff's biological mother is Shirlynne Craddock.  Ms. Craddock arranged to give Plaintiff up for adoption to her friend and neighbor, Holly Bellinger.  Ms. Bellinger already had one daughter as did Ms. Craddock.  Ms. Bellinger stayed at the hospital with Ms. Craddock and Plaintiff after Plaintiff's birth, but because the adoption was not yet complete, the hospital released Plaintiff to his biological mother.  Ms. Craddock planned to give Plaintiff to Ms. Bellinger when they got home.

On January 15, 2004, Ms. Craddock and Ms. Bellinger went to the Riley County Healthy Start/WIC office with Plaintiff for a scheduled appointment.  During the appointment, Barbara Gassman, a Healthy Start Home Visitor, observed three bruises around Plaintiff's mouth, which looked like they had been caused by the pacifier being pushed into Plaintiff's mouth.  Ms. Gassman asked Ms. Bellinger about the bruises and Ms. Bellinger told her that her daughter had hit Plaintiff with a toy.  Ms. Bellinger also told Ms. Gassman that Plaintiff had his well-baby exam later that day.

Ms. Gassman was concerned about the bruises and other behavior of Ms. Bellinger.  She reported her concerns to Kim Kluesner, a New Parent Support Program Worker.  Ms. Gassman also told Ms. Kluesner that Ms. Bellinger was on the way to Plaintiff's well-baby exam.  Ms. Kluesner then called Christine Campbell of Social Work Service to report the information that she received from Ms. Gassman.  Ms. Campbell confirmed that Plaintiff had a well-baby exam at

6

the IACH.  After speaking with Ms. Kluesner, Ms. Campbell called the military police and relayed the information she received from Ms. Kluesner.  She also told them that Ms. Bellinger was at the IACH with Plaintiff.  Meanwhile, Ms. Kluesner called the Well Baby Clinic at IACH, relayed Ms. Gassman's concerns, and asked that the doctor be given the information so that the child could be evaluated during the well-child exam.  A social worker, Rosetta Allen, and military police responded to the IACH clinic at the time of Plaintiff's well-baby exam.

Plaintiff was seen at his well-baby exam at IACH on January 15, 2004 by Captain Wayne Darsow, a family nurse practitioner.  Ms. Craddock and Ms. Bellinger were both present in the examination room.  During Plaintiff's examination, Captain Darsow noted that Plaintiff was well consoled, behaved normally, and was able to move his extremities.  No abnormalities were noted upon examination of Plaintiff's skin and palpitation of Plaintiff's skull, scalp, and bones. Plaintiff had some diaper rash, what appeared to be thrush, and some small bruises on his face and on his sternum.  The bruises were smaller than a pencil eraser and difficult to see.  Captain Darsow asked both Ms. Craddock and Ms. Bellinger about the bruises.  Ms. Bellinger told him that her older child had hit Plaintiff in the head with a toy.  He was also informed that Plaintiff had a lot of bruising at birth.

Due to his concern about the explanation of the bruising, Captain Darsow requested assistance from pediatrician Dr. Thomas Talbot in examining Plaintiff.  Dr. Talbot examined Plaintiff and observed that he had bruising about the mouth, which was not well delineated, and had small bruises on his upper abdomen toward the chest.  Dr. Talbot also observed that Plaintiff was a pleasant-appearing child, well formed, without distress, and had exceeded his birth weight, indicating he was getting adequate nutrition.  There were no other bruises on Plaintiff's body.

7

Aside from thrush, diaper rash, and a few bruises, Plaintiff appeared completely normal and healthy.  Ms. Bellinger told Dr. Talbot that Plaintiff had facial bruising at birth that had improved and that Plaintiff had a family history of similar bruising.  Ms. Bellinger appeared at ease, and Dr. Talbot believed her.  Ms. Craddock assured Captain Darsow and Dr. Talbot that she was at the Bellinger residence all the time and that there was no way Ms. Bellinger was abusing Plaintiff.

Based upon his examination of Plaintiff, the pattern of bruising, and Ms. Bellinger's and Ms. Craddock's statements, Dr. Talbot considered bleeding problems such as factor deficiencies and disorders, hemophilia, and transient neonatal thrombocytopenia.  Dr. Talbot had recently seen a case of neonatal thrombocytopenia with a presentation similar to Plaintiff.  He formed a working diagnosis of neonatal thrombocytopenia, which is a condition of platelet destruction by an immune process.  Accordingly, Dr. Talbot requested a follow-up examination of Plaintiff and a complete blood count and coagulation panel, and Plaintiff was given medication for his thrush.

After his examination of Plaintiff, Dr. Talbot met with the social worker and military police who were waiting outside.  Dr. Talbot informed the social worker and military police that he was aware of the bruising on Plaintiff, he thought there was a medical condition causing the bruising, and that medical staff would be following up with Plaintiff.

Plaintiff's lab results came back on January 15 and 16, 2004, showing Plaintiff's platelet count was in the normal range, with the presence of giant platelets.  Captain Darsow did not believe the lab explained the bruises and that it essentially ruled out thrombocytopenia.  But Dr. Talbot believed the presence of giant platelets was consistent with a child recovering from neonatal thrombocytopenia.

When Ms. Bellinger brought Plaintiff back to the clinic on Tuesday, January 20, 2004, for a follow-up visit, they were turned away without Plaintiff having been examined because Captain Darsow was not in the clinic.  Also on January 20, 2004, Ms. Gassman and Ms. Kluesner went to see Plaintiff at Ms. Bellinger's home.  Ms. Gassman observed additional bruises, but she did not report the bruises because Dr. Talbot had informed them that the bruising was from a skin condition.

On January 29, 2004, Plaintiff had not yet been rescheduled for a follow-up exam and Captain Darsow requested that the clinic nurse call Ms. Bellinger or Ms. Craddock to have Plaintiff brought to the clinic for the follow-up exam.  But on that same day, before Captain Darsow made his request, Ms. Bellinger brought Plaintiff to the emergency room in Geary Community Hospital.  Plaintiff was unresponsive, lethargic, and having seizures.  He had multiple skull fractures and an epidural hematoma.  Plaintiff was transferred by air ambulance from Junction City to Children's Mercy Hospital in Kansas City.  Today, Plaintiff suffers from cerebral palsy as a result of these injuries.

On March 24, 2004, Ms. Bellinger was indicted on one count of assault of a child (Plaintiff) in the United States District Court for the District of Kansas.  She pled guilty on September 15, 2004 and was sentenced to 41 months in prison.

C.    **Discussion**

 Plaintiff's claim arises under the Federal Tort Claims Act ("FTCA"), which grants limited waiver of sovereign immunity for claims against the United States for "personal injury . . . by the negligent or wrongful act or omission of any employee of the Government

while acting within the scope of his office or employment."[16]   Under the FTCA, the United States is liable only for tort claims "in the same manner and to the same extent as a private individual under like circumstances,"[17] "in accordance with the law of the place where the act or omission occurred."[18]   "Even if specific behavior is statutorily required of a federal employee, the government is not liable under the FTCA unless state law recognizes a comparable liability for private persons."[19]   Thus, to determine whether the government is entitled to judgment as a matter of law, the Court must look to the state statutory and common law jurisprudence.[20]   Here, all alleged acts and omissions occurred in Kansas, and so Kansas state law applies.

Plaintiff claims medical negligence occurred when Dr. Talbot and Captain Darsow breached a duty to diagnose and treat Plaintiff for child abuse.  To establish liability for medical negligence under Kansas common law, Plaintiff must show (1) the healthcare provider owed the patient a duty of care, (2) the healthcare provider breached that duty or deviated from the applicable standard or care, and (3) the patient's injury proximately resulted from the healthcare provider's breach.[21]   Within the duty of care, healthcare professionals have a duty to use reasonable care and diligence in the diagnosis, care, and treatment of a patient.[22]   While Plaintiff remains adamant that he does not base his lawsuit on a duty to report child abuse, Plaintiff

---

[16]28 U.S.C. § 1346.

[17]*Id.* § 2674.

[18]*Id.* § 1346.

[19]*Ayala v. United States*, 49 F.3d 607, 611 (10th Cir. 1995) (citing *Zabala Clemente v. United States*, 567 F.2d 1140, 1149 (1st Cir. 1977)).

[20]*See id.*

[21]*Esquivel v. Watters*, 183 P.3d 847, 850 (2008).

[22]*Perkins v. Susan B. Allen Mem'l Hosp.*, 146 P.3d 1102, 1106 (2006).

argues that as a part of the duty to diagnose and treat Plaintiff, the healthcare professionals had a duty to report the child abuse to the appropriate authorities.

Captain Darsow and Dr. Talbot examined Plaintiff during his two-week well-baby exam. During the visit, both Captain Darsow and Dr. Talbot noticed bruising on the baby, and while they suspected possible child abuse, they eventually attributed the bruises to a blood condition. The healthcare professionals then ordered blood tests and sent Plaintiff home with Ms. Bellinger. Neither Captain Darsow nor Dr. Talbot saw Plaintiff for another appointment after the initial well-baby exam.  Plaintiff does not contend that the medical treatment of the bruises present at the well-baby exam caused the injuries alleged in the Complaint, nor does Plaintiff contend that he suffered permanent damages from those injuries.  The only contention is that Dr. Talbot and Captain Darsow failed to properly diagnose and treat the child abuse—i.e., report the abuse to the appropriate authorities—and as a result, Ms. Bellinger was allowed to abuse Plaintiff after the well-baby exam, causing catastrophic neurological injuries.  Put differently, Plaintiff claims that the healthcare professionals not only had the duty to diagnose and treat the baby's immediate medical condition but also had a duty to diagnose the nonmedical cause of the injuries and report the injuries so that further abuse by Ms. Bellinger could be prevented.  Thus, whether Dr. Talbot and Captain Darsow had a duty to report child abuse is necessarily at issue in this case.

The issue of whether a duty exists is a question of law.[23]  Without a duty, there can be no breach and no recovery.[24]  So the Court must first determine whether Dr. Talbot and Captain

---

[23]*Woodruff v. City of Ottawa*, 951 P.2d 953, 956 (Kan. 1997).

[24]*Nero v. Kansas State University*, 861 P.2d 768, 772 (Kan. 1993) (citing *Hackler v. U.S.D. No. 500*, 777 P.2d 839 (Kan. 1989)).

Darsow had a duty to report child abuse within their duty to diagnose and treat Plaintiff before addressing any of the other elements of medical negligence.  A legal duty can arise under common law or statutory law.[25]  But in *Kansas State Bank and Trust Co v. Specialized Transportation Services*, the Kansas Supreme Court determined that the child abuse reporting statute in Kansas does not create civil liability for failure to report child abuse.[26]  Thus, whether Dr. Talbot and Captain Darsow had a duty to report the child abuse must be determined under Kansas common law medical negligence.

Plaintiff has cited no Kansas cases—and the Court has similarly found none—that discuss whether a doctor has a common law duty to report child abuse of a patient within the duty to diagnose and treat.  Plaintiff, however, has cited to other jurisdictions that have examined whether a doctor is negligent when failing to report child abuse.[27]  Some jurisdictions have found that healthcare professionals have a duty to report child abuse and that failure to do so results in civil liability.[28]  In most of those cases, however, courts finding liability determine that the state's statutory law creates civil liability for failure to report.[29]  As explained above, Kansas has no such statutory liability.  As a result, the reasoning of courts relying on statutory law to find a duty to report child abuse is inapplicable here.  Fewer courts find civil liability under common

---

[25]*Wicona v. Strecker*, 747 P.2d 167, 174 (Kan. 1987).

[26]819 P.2d 587, 604 (Kan. 1991).

[27]*See, e.g.*, *First Commercial Trust Co. v. Rank*, 915 S.W.2d 262, 267 (Ark. 1996); *Landeros v. Flood*, 17 Cal. 3d 399, 409–15 (1976); *Chapa v. United States*, No. 8:04CV376, 2005 WL 2170090, at *5 ( D. Neb. Sept. 7, 2005); *Aman v. Cabacar*, No. Civ 06-1020, 2007 WL 2684866, at *3–4 (D.S.D. Sept. 6, 2007); *Heidt v. Rome Mem'l Hosp.*, 278 A.D.2d 786, 786 (N.Y. App. Div. 2007).

[28]*See, e.g.*, *First Commercial Trust Co.*, 915 S.W.2d at 267; *Landeros*, 17 Cal. 3d at 409–15; *Chapa*, 2005 WL 2170090, at *5; *Aman*, 2007 WL 2684866, at *3–4; *Heidt*, 278 A.D.2d at 786.

[29]*First Commercial Trust Co.*, 915 S.W.2d at 267; *Landeros*, 17 Cal. 3d at 409–15; *Aman*, 2007 WL 2684866, at *3–4.

law after deciding that the reporting statute creates no private cause of action.[30]

Other courts have found that healthcare professionals have no common law duty to report child abuse as part of their duty to diagnose and treat patients.[31]  In *Cechman v. Travis*, for example, the Court of Appeals of Georgia determined that healthcare professionals have no common law duty to discover and report nonmedical sources of injuries such as child abuse.[32] The court explained that no matter how innocent the plaintiff, the court would not impose a duty upon healthcare professionals that fell outside of their professional medical duties.[33]  Further, the court explained that while the healthcare professionals were statutorily required to report child abuse and morally obligated to do so, no common law duty to report existed within their duty to treat a patient.[34]  Similarly, in *David v. Erie County Department of Human Services*, the Ohio Court of Appeals stated that it would not "impose a common law duty upon any hospital or physician to prevent abused children from further abuse," explaining that doctors only have "the duty to provide reasonable medical care," and that "[d]iagnosing and preventing child abuse does not constitute medical care."[35]  Both courts emphasized their reluctance to expand the duty of healthcare professionals beyond medical treatment to encompass affirmative acts to prevent future harm.[36]

---

[30]*Chapa*, 2005 WL 2170090, at *5; *Heidt*, 278 A.D.2d at 786.

[31]*Cechman v. Travis*, 414 S.E.2d 282 (Ga. Ct. App. 1991); *David v. Erie Cnty Department of Human Servs.*, No. E-93-40, 1994 WL 319053 (Ohio Ct. App. June 30, 1994).

[32]414 S.E.2d at 286.

[33]*Id.* at 284

[34]*Id.* at 285.

[35]1994 WL 319053, at *2.

[36]*See id.*; *Cechman*, 494 S.E.2d at 285.

13

This Court finds that Kansas law is consistent with those jurisdictions determining that common law does not recognize a cause of action for medical negligence based on failure to report child abuse.  First, under Kansas common law, "[g]enerally, an actor has no duty to control the conduct of a third party to prevent that person from causing harm to others unless there is a special relationship between the actor and the third party or the actor and the injured party."[37]  The court has warned of the slippery slope of unlimited liability that could occur if a court judicially creates a new legal duty.[38]  Here, the doctor and nurse practitioner had a duty to treat Plaintiff's current medical injuries, and they did that.  Plaintiff has cited no Kansas case that shows that healthcare professionals have a continued duty to protect patients from the harmful acts of another.  In fact, the medical malpractice cases cited by Plaintiff only address healthcare professionals' failure to treat the medical injuries or illnesses present during the examination and not injuries or illnesses sustained after the health examination.[39]  So the Court is reluctant to impose an affirmative duty on healthcare professionals when that duty has not yet been recognized by Kansas courts.

Second, the Kansas Supreme Court in *Kansas State Bank and Trust Co.* seemed to

---

[37]*D.W. v. Bliss*, 112 P.3d 232, 238–39 (Kan. 2005); *see also Boulanger v. Pol*, 900 P.2d 823, 833 (Kan. 1995) (explaining that Kansas follows the Restatement (Second) of Torts for the duty to control the conduct of third persons and that under the facts of the case, the psychiatrist had no duty to protect others from harm caused by patient).

[38]*Bliss*, 112 P.3d at 240.

[39]*Delaney v. Cade*, 873 P.2d 174 (Kan. 1994) (explaining that the healthcare professional failed to properly treat plaintiff's leg injury, which resulted in loss of chance that she would regain use of her legs); *Roberson v. Counselman*, 686 P.2d 149, 152 (Kan. 1984) (explaining that the chiropractor could be liable for failing to refer the patient for proper medical treatment when he had symptoms of acute heart failure); *Durflinger v. Artiles*, 673 P.2d 86 (Kan. 1983) (finding that a psychiatrist could be liable for negligent release of a patient suffering from mental disease and violent propensities based on Kansas statutory law); *Munoz v. Clark*, 199 P.3d 1283 (Kan. Ct. App. 2009) (explaining that the doctor failed to remove plaintiff's ovaries during a surgery to remove them); *Perkins v. Susan B. Allen Mem'l Hosp.*, 146 P.3d 1102 (Kan. Ct. App. 2006) (discussing whether healthcare professionals were liable for medical malpractice when plaintiff was injured during x-rays).

14

suggest that no common law duty to report exists in Kansas.[40]  The court explained that the legislature created no private cause of action for failure to report child abuse in the reporting statute.[41]  The court discussion of whether the legislature created a private cause of action within the statute suggests that a private cause of action did not otherwise exist at Kansas common law and that the reporting statute defined the duty to report child abuse.[42]  Within the decision, the court also quoted a portion of *Borne v. Northwest Allen County School Corp.*,[43] an Indiana Court of Appeals case, which stated: "'[T]here is no apparent intent to authorize a civil action for failure of an individual to make the oral report . . . contemplated by the act.  Furthermore, such an action is not authorized at common law and its maintenance would raise substantial questions of causation since the failure would not in the direct sense be a proximate cause of the injury to the child.'"[44]  The court cited to this portion of *Borne* to support its conclusion that the Kansas legislature had not intended to grant a private right of action in the reporting statute and its finding that no private cause of action could exist for school officials' failure to report child abuse.[45]  The absence of discussion of any possible duty under Kansas common law suggests that there is no common law duty to report.[46]

      And while a medical professional's failure to report was not at issue in *Kansas State*

---

[40] *See* 819 P.2d 587 (Kan. 1991).

[41] *Id.* at 604.

[42] *See id.*

[43] 532 N.E.2d 1196 (Ind. Ct. App. 1989).

[44] *Kansas State Bank & Trust Co.*, 819 P.2d at 604 (quoting *Borne*, 532 N.E.2d at 1203).

[45] *See id.*

[46] *See id.*

*Bank and Trust Co.* or in *Borne*, the Kansas Supreme Court cited to another case where a doctor's failure to report suspected child abuse was at issue.[47]  In *Landeros v. Flood*, the California Supreme Court determined that a doctor could be negligent under medical malpractice for failure to report suspected child abuse.[48]  But the Kansas Supreme Court in *Kansas State Bank and Trust Co.* decided against the approach taken by the California court.[49]  Again, the Kansas Supreme Court did not specifically address Kansas common law for medical negligence, but after discussing *Landeros*, the Court cautioned against judicial creation of a private cause of action for a duty to report.[50]  Taken as a whole, the *Kansas State Bank and Trust Co.* illustrates the absence of any duty to report under Kansas law—statutory or common law.

Thus, this Court cannot conclude that Kansas common law recognizes a cause of action for medical negligence based on the duty to report child abuse.  As such, the Court finds that Dr. Talbot and Captain Darsow did not owe Plaintiff a duty to report his injuries as child abuse. Without a duty, there can be no breach or recovery, and so the Court need not address the other elements of the medical negligence claim.  Because Plaintiff's only allegation relies on a duty to report child abuse within medical negligence, Defendant is entitled to judgment as a matter of law on Plaintiff's claim and thus the Court must grant Defendant summary judgment.

**IV.    Remaining Motions**

Because the Court grants Defendant summary judgment, the remaining motions are moot.

---

[47]*See id.* at 603–04 (citing *Landeros v. Flood*, 17 Cal. 3d 399 (1976)).

[48]17 Cal. 3d 399, 409–15 (1976)

[49]*Kansas State Bank & Trust Co.*, 819 P.2d at 604.

[50]*See id.*

First, Plaintiff's motion to amend the Pretrial Order does not change the Court's analysis. Plaintiff sought to narrow the Pretrial Order by withdrawing allegations. With those allegations withdrawn, Defendant is still entitled to summary judgment on the remaining claim as discussed above. Second, in his motion to exclude evidence, Plaintiff argues that the Court should exclude evidence offered by Defendant's expert witnesses on Plaintiff's life expectancy. Because the Court grants Defendant summary judgment, the Court need not determine whether expert testimony on Plaintiff's life expectancy should be excluded. Finally, in his motion for partial summary judgment, Plaintiff argues that the court should preclude Defendant from comparing the negligence of any person not a party to the lawsuit to Defendant's own negligence. Again, because Defendant is entitled to judgment as a matter of law, the availability of Defendant's comparative fault defense is irrelevant. And so the Court denies Plaintiff's three motions as moot.

## V.   Conclusion

Ms. Bellinger caused tremendous harm and misled many individuals involved in Plaintiff's care. She gained the confidence of Plaintiff's biological mother, who vouched for Ms. Bellinger's abilities as a mother. Ms. Bellinger also appeared at ease with the baby during her time at IACH. Captain Darsow and Dr. Talbot may have suspected child abuse, but after speaking with Ms. Craddock and Ms. Bellinger, they formed a different conclusion about the cause of the bruising. After they sent Plaintiff home with Ms. Bellinger, she abused Plaintiff, causing severe and permanent damage. It is a tragedy that E.P. continued in the care of Ms. Bellinger, despite concerns and suspicions, albeit suspicions that were allayed by the laboratory results and assurances provided by the biological mother. Nonetheless, the Court cannot find

that the healthcare providers breached a legal duty by failing to report any suspicions of child abuse.  Under Kansas law there is no legal duty for doctors to report child abuse within the duty to diagnose and treat.  Thus, Plaintiff cannot maintain a cause of action against Defendant for Dr. Talbot and Captain Darsow's medical treatment of Plaintiff.

**IT IS HEREBY ORDERED BY THE COURT** that Defendant's Motion to Dismiss or in the Alternative, Motion for Summary Judgment (Doc. 133) is **GRANTED**.

**IT IS FURTHER ORDERED** that Plaintiff's Motion to Amend Pretrial Order (Doc. 136), Plaintiff's Motion for Partial Summary Judgment (Doc. 122), and Plaintiff's Motion to Exclude Defendant's Evidence of E.P.'s Life Expectancy (Doc. 110) are **DENIED** as moot.

Dated: <u>December 7, 2011</u>

         S/ Julie A. Robinson
         JULIE A. ROBINSON
         UNITED STATES DISTRICT JUDGE